01
02
03
04
05
06
07

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

08  MATTHEW G. SILVA,                     )    CASE NO. C04-1885-JLR
                                          )
09        Plaintiff,                      )
                                          )
10        v.                              )    REPORT AND RECOMMENDATION
                                          )
11  LARRY MAYES, et al.,                  )
                                          )
12        Defendants.                     )
    _____ )

13

14                              Introduction

15        Plaintiff proceeds *pro se* and *in forma pauperis* in this 42 U.S.C. § 1983 action.  He names

16  as defendants in his first amended complaint Larry Mayes, King County, Ron Sims, Reed

17  Holtgeertz, Bob DeNeui, Teri Hansen, Sue Belt, Herb Myers, Jerry Hardy, M.D. Woodbury, Ms.

18  Kramer, Sergeants Hjellen and Jones, and correction officers Coleman, Dejesus, Lockhart, Rogers,

19  Sabo, as well as unnamed correction officers.  (Dkt. 11.)  Plaintiff asserts twenty-one counts

20  against defendants, including allegations of punishment without due process (counts 1, 3, 6, 7, 8,

21  16); retaliation (counts 4, 9, 10, 17); failure to supervise/train (counts 2, 5); procedural due

22  process violations (counts 11, 12, 13, 14, 18, 19, 20); a substantive due process violation (count

REPORT AND RECOMMENDATION
PAGE -1

01  15); and a freedom of religion complaint (count 21).  (*Id.*)

02      This matter comes before the Court on plaintiff's motion for partial summary judgment

03  (Dkt. 81) and defendants' motion for summary judgment and dismissal of plaintiff's claims (Dkt.

04  137.)  It should be noted that, although he did not present any statement of facts or argument in

05  response to defendants' motion, plaintiff did reply that the claims in his amended complaint are

06  true and accurate and asked that defendants' motion be stricken.  (Dkt. 190.)  It should also be

07  noted that, upon its request, the Court received supplemental briefing from the parties with respect

08  to plaintiff's motion.  (*See* Dkts. 196, 205, & 207.)

09      Having considered the papers and pleadings submitted by the parties, as well as the balance

10  of the record in this matter, it is recommended that plaintiff's motion be denied, that defendants'

11  motion be granted, and that this matter be dismissed.

12                    <u>Proposed Findings of Fact</u>

13      Plaintiff submitted his first amended complaint as a pretrial detainee at the King County

14  Regional Justice Detention Center (RJC) in Kent, Washington.  At some point during the course

15  of these proceedings, plaintiff was convicted and held at the RJC as a post-trial detainee.  He is

16  now being held at a different correctional facility.

17      Upon entering the RJC as a pretrial detainee on April 5, 2004, RJC staff classified plaintiff

18  as a "close custody" or "close security" inmate.  (Dkts. 22, 97, & 142.)  RJC staff base initial

19  classification decisions on consideration of the current charge and previous convictions.  (*Id.*)  The

20  RJC considers close security inmates to be a part of the general population, but with a higher

21  security level classification.  (Dkts. 21 & 22.)

22      As a close security inmate, RJC staff housed plaintiff in the facility's D-Unit.  Although

REPORT AND RECOMMENDATION
PAGE -2

01  considered by the RJC to be the primary location for close security inmates, the D-Unit houses

02  both close and "medium" security inmates, the latter being a lower security level within the general

03  population of inmates.[1]  (*Id.*)  Inmates in the D-Unit face greater restrictions than those in some

04  other RJC housing units.  D-Unit inmates must remain in their cells for all but three hours a day,[2]

05  eat meals in their cells rather than in a group setting, and have different access to religious

06  programming.  (*See* Dkts. 21, 22, & 97.)  With respect to the latter issue, plaintiff maintains that

07  no group worship is accessible in the D-Unit, while defendants first maintained that religious

08  programming is available on an individual, rather than a group basis (*see* Dkt. 22 at 2), and later

09  asserted the availability of a bi-weekly church service, in addition to individual counseling upon

10  request (*see* Dkt. 97 at 4).  Also, plaintiff maintains that D-Unit conditions are inferior with

11  respect to cleaning supplies, mattresses, hair care supplies, and cell temperatures, while defendants

12  aver that the D-Unit is treated the same as other units in these respects.

13       The RJC allows inmates to "override" classification from close to medium security.  (Dkts.

14  22 & 97.)  Department of Adult and Juvenile Detention (DAJD) policy defines an override as "an

15  increase or decrease in the assigned security level based on consideration of factors such as

16  behavior, case notoriety, [or] type of criminal history or risk."  (Dkt. 76, Ex. A.)

17       The RJC is a direct supervision jail, meaning one officer directly supervises a group of

18

19      [1] It is unclear whether the D-Unit continues to house both close and medium security
20  inmates to this day.  (*See* Dkt. 57 at 2.)  However, this issue is not pertinent to the resolution of
    the pending motions for summary judgment.

21      [2] Plaintiff states that medium-security inmates are allowed outside of their cells eight to
22  nine hours a day.  (Dkt. 81 at 3.)  Defendants note that inmates in Administrative Segregation and
    Disciplinary Segregation must remain in their cells twenty-three hours a day.  (Dkt. 97, ¶ 9.)

REPORT AND RECOMMENDATION
PAGE -3

01  inmates. (Dkt. 142.)  An officer arriving on shift verbally conveys expectations for that shift to the

02  inmates.  (*Id*.)  Upon determining that these expectations have not been met, an inmate is subject

03  to an "onsite adjustment."  (*Id*., ¶¶ 4-6.)  An officer renders an onsite adjustment for behavior not

04  considered serious enough to warrant an infraction and subsequent discipline, such as disciplinary

05  segregation or loss of good-time.  (*Id*.)

06          Plaintiff's first override from close to medium security lasted from May 19, 2004 until June

07  18, 2004.  (Dkt. 97, Ex. A.)  During that time, he was subject to onsite adjustments by officers on

08  shift in his unit, including being "racked back" to his cell for certain periods of time.  (*See* Dkts.

09  11 & 142.)  Plaintiff was racked back to his cell for not making his bed properly and for failing to

10  close his cell door.  (*Id*.)  In other instances, plaintiff was a part of a group of inmates racked back

11  to their cells for determinations of unacceptable behavior, including a derogatory comment made

12  by one inmate and noise level in the unit.  (*Id*.)

13          On June 13, 2004, Officer Sabo infracted plaintiff for stating "this is bullshit" and kicking

14  his cell door.  (*See* Dkt. 11, App. 15.)  Documentation supports that the hearing on this matter

15  occurred either on June 17, 2004 (*see* Dkt. 97, Ex. B), as plaintiff contends, or on the preceding

16  day (*see* Dkt. 11, App. 15).  Based on plaintiff's admission that he used the word "bullshit," he

17  was found guilty of being defiant and insolent; he was not found guilty of any violation in response

18  to the alleged kicking of his door.  (*Id*.)  The RJC imposed three days disciplinary deadlock as a

19  result of this infraction, but suspended the punishment, and denied his appeal. (    *Id*.)  Also,

20  pursuant to a periodic review, the RJC revoked plaintiff's override, on June 18, 2004, for "defiant

21  behavior" and "non-compliance with directives and unit expectations."  (Dkt. 97, Ex. C (altered

22  to lower case in quotations)).

REPORT AND RECOMMENDATION
PAGE -4

01        Plaintiff's second override occurred between July 22, 2004 and July 31, 2004.  (*Id.*, Ex.

02  A.)  On July 31, 2004, Officer Coleman racked plaintiff back to his cell for not properly making

03  his bed. (*See* Dkt. 140, Ex. A.)  She described a verbal confrontation she had with plaintiff

04  relating to this onsite adjustment in an incident report on that same date. ( *Id.*) The RJC

05  consequently revoked plaintiff's override based on "persistent[] challenge[s]" to Officer Coleman

06  and "ongoing challenging and disruptive behavior." (Dkt. 97, Ex. C (altered to lower case in

07  quotations.)) This was deemed plaintiff's "last opportunity for an override for the duration of [his]

08  booking." *Id.*[3]

09        Plaintiff filed a substantial number of grievances and kites during his stay at the RJC.  (*See*,

10  *e.g.*, Dkts. 11 & 142.)

11                                          <u>Proposed Conclusions of Law</u>

12        Summary judgment is appropriate when "the pleadings, depositions, answers to

13  interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

14  genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

15  of law." Fed. R. Civ. P. 56(c);*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving

16  party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

17  showing on an essential element of his case with respect to which he has the burden of proof.

18  *Celotex*, 477 U.S. at 322-23.  "[A] party opposing a properly supported motion for summary

19  judgment may not rest upon mere allegation or denials of his pleading, but . . .  must set forth

20

---

21      [3] Plaintiff asserts his placement in medium security on three separate occasions.  However,
documentation submitted by defendants shows only two overrides to medium security.  (*See* Dkt.

22  97, Exs. A & C.)  In any event, based on the discussion of overrides below, any dispute as to this
issue is not material.

01  specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477

02  U.S. 242, 256 (1986) (citing Fed. R. Civ. P. 56(e)).

03       Plaintiff here pursues claims pursuant to 42 U.S.C. § 1983.  Such a claim requires an

04  allegation of the violation of a right secured by the Constitution and laws of the United States, and

05  a showing that a person acting under color of state law committed the alleged deprivation.  *West*

06  *v. Atkins*, 487 U.S. 42, 48 (1988).

07  A.    <u>Plaintiff's Motion for Partial Summary Judgment</u>

08       Plaintiff alleges defendants violated his Fourteenth Amendment due process rights by

09  failing to afford him notice and hearings upon his transfers to the more restrictive D-Unit.  He

10  maintains that Title 289 of the Washington Administrative Code (WAC), in combination with

11  Revised Code of Washington (RCW) 70.48.071 and various jail policies, establishes a state

12  created liberty interest in freedom from placement in the RJC's D-Unit.

13       The procedural guarantees of the Fourteenth Amendment's Due Process Clause apply only

14  when a constitutionally protected liberty or property interest is at stake.  *Ingraham v. Wright*, 430

15  U.S. 651, 672 (1977).  Liberty interests protected by the Fourteenth Amendment may arise from

16  either the Due Process Clause itself or from state laws.  *Meachum v. Fano*, 427 U.S. 215, 223-27

17  (1976).  A prisoner does not have a constitutional right to a particular classification status.

18  *Hernandez v. Johnston*, 833 F.2d 1316, 1318 (9th Cir. 1987) (citing *Moody v. Daggett*, 429 U.S.

19  78 (1976)).  Therefore, as indicated above, plaintiff asserts a liberty interest in classification arising

20  from state law through the enactment of certain statutory or regulatory measures.

21       This claim gives rise to an initial dispute regarding the proper test to apply.  As discussed

22  below, the question of the appropriate test to apply in determining whether an inmate has a

REPORT AND RECOMMENDATION
PAGE -6

01   protected liberty interest under state law depends largely on whether an inmate is a pre-trial

02   detainee or is post-conviction.

03        In *Hewitt v. Helms*, 459 U.S. 460 (1983), the United States Supreme Court set forth a test

04   looking to whether a State law "set[s] forth '"substantive predicates" to govern official decision

05   making' and . . . contain[s] 'explicitly mandatory language,' *i.e.*, a specific directive to the

06   decisionmaker that mandates a particular outcome if the substantive predicates have been met."

07   *Valdez v. Rosenbaum*, 302 F.3d 1039, 1044 (9th Cir. 2002) (quoting *Kentucky Dep't of*

08   *Corrections v. Thompson*, 490 U.S. 454, 462-63 (1989) (quoting *Hewitt*, 459 U.S. at 471-72)).

09   The Supreme Court determined that the State regulations at issue in *Hewitt* created a liberty

10   interest for an inmate to remain in the general prison population based on the mandatory character

11   of the language and the inclusion of substantive predicates.  459 U.S. at 471-72.

12        The Supreme Court subsequently curtailed the *Hewitt* test in *Sandin v. Conner*, 515 U.S.

13   472, 484 (1995).  It found that the approach in *Hewitt* "encouraged prisoners to comb regulations

14   in search of mandatory language on which to base entitlements to various state-conferred

15   privileges[,]" and had the "undesirable effects" of discouraging states from codifying prison

16   management procedures and involving federal courts in the day-to-day management of prisons.

17   *Id.* at 481-82.  *Sandin* "refocused the test for determining the existence of a liberty interest away

18   from the wording of prison regulations and toward an examination of the hardship caused by the

19   prison's challenged action relative to 'the basic conditions' of life as a prisoner." *Mitchell v.*

20   *Dupnik*, 75 F.3d 517, 523 (9th Cir. 1996) (quoting *Sandin*, 515 U.S. at 485).  Pursuant to *Sandin*,

21   state regulations do not afford a prisoner a protected liberty interest entitling him to procedural

22   protections unless the action by prison officials serves to increase his sentence or results in

REPORT AND RECOMMENDATION
PAGE -7

01   "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

02   515 U.S. at 484.  The Supreme Court found, in that case, that a convicted prisoner's placement

03   in disciplinary segregation "did not present the type of atypical, significant deprivation in which

04   a State might conceivably create a liberty interest."  *Id.* at 486.

05          The Ninth Circuit Court of Appeals, however, continues to apply the *Hewitt* test in cases

06   involving pretrial detainees.  *See, e.g.*, *Valdez*, 302 F.3d at 1044 & n.3; *Carlo v. City of Chino*,

07   105 F.3d 493, 498-99, 499 n.1 (9th Cir. 1997); *Mitchell*, 75 F.3d at 524.  In so doing, the Ninth

08   Circuit has noted that *Sandin*'s reasoning applied particularly to convicted prisoners "whose

09   incarceration 'serves different aims' than pre-trial detainees."  *Valdez*, 302 F.3d at 1044 & n.3

10   (quoting and citing *Sandin*, 515 U.S. at 484 & n.5, and noting that the Supreme Court explicitly

11   declined to overrule its prior decisions).  That is, while pretrial detainees are incarcerated to ensure

12   their presence at trial and have a liberty interest based in the federal constitution in not being

13   punished without due process, *Carlo*, 105 F.3d at 499 & n.1, "'"[l]awful incarceration [of

14   convicted prisoners] brings about the necessary withdrawal or limitation of many privileges and

15   rights,"'"  *Sandin*, 515 U.S. at 485 (quoted sources omitted).

16          Yet, defendants note that the Ninth Circuit applied *Sandin* to a cell search claim brought

17   by a pretrial detainee in *Mitchell*.  In that case, the court found the *Sandin* analysis appropriate

18   where the search was "not imposed as punishment and does not involve a more restrictive level

19   of incarceration to which a sentence is relevant; it is a general security measure of the kind that

20   the Supreme Court has said pretrial detainees may be subjected."  75 F.3d at 523. *See also Carlo*,

21   105 F.3d at 499 & n.1 (noting *Mitchell's* holding that, in some cases, *Sandin* will apply to the

22   claims of pretrial detainees).  *But cf. Valdez*, 302 F.3d at 1042-45 (applying *Hewitt* to plaintiff's

REPORT AND RECOMMENDATION
PAGE -8

01    challenge to telephone access restriction upon his placement in administrative segregation).

02        Here, plaintiff argues the applicability of *Hewitt* based on his status as a pretrial detainee

03    at all times relevant to his claims.  Defendants, asserting that plaintiff is not being punished, aver

04    the applicability of *Sandin*.  They alternatively argue that, even applying the more lenient *Hewitt*

05    standard, plaintiff nonetheless fails to establish any violation of his right to due process.  Giving

06    plaintiff the benefit of the doubt, the undersigned assumes for the purposes of this Report and

07    Recommendation that *Hewitt* applies.  In so doing, however, the undersigned concludes that WAC

08    Title 289, RCW 70.48.071, and jail policies, either alone or in combination, do not suffice to

09    create a liberty interest in freedom from D-Unit placement.

10        1.    WAC Title 289 and RCW 70.48.071:

11        WAC Title 289 contains rules adopted by the Washington Corrections Standards Board.

12    Plaintiff points specifically to WAC 289-16-230, concerning the classification/segregation of

13    prisoners in detention and correctional facilities, and WAC 289-12-030, concerning new detention

14    and correctional facilities, as the sources of the alleged liberty interest.  As an initial matter, the

15    parties dispute the continuing validity of Title 289.  As noted by defendants, in 1987, the

16    Washington State Legislature abolished the Corrections Standards Board which had adopted Title

17    289.  *See* 1987 Wash. Laws Ch. 462 (governing the transfer of powers, duties, and functions of

18    the Corrections Standards Board).  The Corrections Standards Board did not repeal its regulations

19    prior to its dismantling and the State continues to print Title 289 in the WAC.  Yet, upon

20    abolishing the Corrections Standards Board, the Legislature determined that:

21        All units of local government that own or operate adult correctional facilities shall,
        individually or collectively, adopt standards for the operation of those facilities no
22        later than January 1, 1988.  Cities and towns shall adopt the standards after

REPORT AND RECOMMENDATION
PAGE -9

01  considering guidelines established collectively by the cities and towns of the state;
02  counties shall adopt the standards after considering guidelines established collectively
    by the counties of the state.  These standards shall be the minimums necessary to meet
03  federal and state constitutional requirements relating to health, safety, and welfare of
    inmates and staff, and specific state and federal statutory requirements, and to provide
04  for the public's health, safety, and welfare.  Local correctional facilities shall be
    operated in accordance with these standards.

05  RCW 70.48.071; 1987 Wash. Laws Ch. 462 § 17.[4]

06       Defendants state that it is not clear why the Corrections Standards Board did not repeal

07  its regulations, nor whether the DAJD adopted classification procedures in response to RCW

08  70.48.071, or continued to follow existing policies or some combination of the two.  Responding

09  to plaintiff's arguments, defendants acknowledge that later jail classification policies and case law

10  refer to WAC 289-16-230.  *See, e.g.*, DAJD Policy 6.03.003 (Critical Inmate Placement) and *State*

11  *v. Silva*, 107 Wn. App. 605, 629 & n.78, 27 P.3d 663 (2001) (stating that WAC 289-22

12  "statutorily requires jails to provide access to legal materials," and citing RCW 70.48.180 in

13  stating that WAC 289-22 was promulgated under the authority of the former RCW 70.48.050).

14       Yet, even assuming the continued validity of WAC 289-16, defendants argue that it does

15  not govern the facts of this case.  That is, defendants assert that WAC 289-16 applies to the formal

16  inmate classification and reclassification process, rather than the overrides at issue here.  The

17  undersigned finds this distinction dispositive of the issue, and further finds no basis for a liberty

18  interest in WAC 289-12-030.

19

20      [4] In arguing the continued relevance of Title 289, plaintiff points to the fact that, in 1988,
    the King County Council adopted Title 289 by motion in response to RCW 70.48.071. (Dkt. 96,
21  Ex. B).  Defendants respond that this motion to adopt has no legal affect in King County pursuant
    to its County Charter.  (*Id.*, Ex. A.)  In any event, for the reasons discussed below, the Court need
22  not further address this issue.

REPORT AND RECOMMENDATION
PAGE -10

01    a. <u>WAC 289-16-230</u>:

02   WAC 289-16-230 states in relevant part:

03  . . . The prisoner shall be promptly informed of any classification housing assignment decision other than "general population," and of his right to have that decision

04  reviewed upon making a request.  Such notice shall also be given with regard to any reclassification action.

05

06  . . . A prisoner who is dissatisfied with his housing assignment shall be entitled to a review of the decision by the department of corrections or chief law enforcement officer upon making a written request, and shall be promptly informed of this right.

07  Such request shall be reviewed by the department of corrections, chief law enforcement officer, or a designated staff member supervisory to the classification

08  committee, within 72 hours of its receipt by staff.  The prisoner shall receive a written decision of the review of such assignment, including reason(s).

09

10 WAC 289-16-230(2)(c)-(d).  As discussed further below, defendants maintain that the D-Unit is

11 a part of the general population, while plaintiff argues it is, in actuality, maintained as a de facto

12 punitive segregation unit.  However, even assuming the D-Unit is a housing assignment other than

13 general population, plaintiff fails to establish the applicability of WAC 289-16-230 to his claims.

14   On its face, WAC 289-16-230 relates to "classification" and "reclassification."  There is

15 no evidence plaintiff was ever reclassified.  Therefore, WAC 289-16-230 could only relate to

16 plaintiff's initial classification as a close security inmate.  However, plaintiff's assertion  that he

17 was improperly classified as a close security inmate upon being booked into the RJC is no more

18 than conclusory.  (*See* Dkt. 11 at 79-81 (averring consideration of "inaccurate information about

19 [his] charge and behavioral history."))  He fails to support the contention that his initial

20 classification was in any respect improper under the classification system utilized by the RJC. [5]

21 _____

22   [5] At best, plaintiff points to an August 4, 2004 letter he sent to defendant Mayes describing the alleged inaccurate information considered.  (*See* Dkt. 16, Ex. 6 at 4.)  An attached response

REPORT AND RECOMMENDATION
PAGE -11

01   Accordingly, plaintiff's conclusory claim regarding his initial classification should be  dismissed.[6]

02   The revocation of plaintiff's overrides – a process governed by DAJD policy, rather than Title 289

03   – is addressed in relation to that policy below.

04              b.    WAC 289-12-030:

05       WAC 289-12-030(2)(a)(iii)(B) states: "Dining area(s) shall allow conversational

06   opportunities in adequate surroundings.  Meals shall not be served in cells, except where necessary

07   for the health, security and/or well-being of prisoners and staff."  However, in this case, although

08   plaintiff takes issue with reasons proffered for the establishment of greater restrictions in the D-

09   Unit, he raises no doubt that, as housing for "close security" inmates, the restrictions are grounded

10   in concerns of security.  Accordingly, because the WAC provision at issue expressly provides an

11   exception for security-based measures, it does not form the basis for a liberty interest in this case.

12       2.    Jail Policies:

13       Plaintiff argues that, even if Title 289 does not apply, jail policies provide a sufficient

14   _____

15   from Mayes states that plaintiff's classification "has been reviewed and is appropriate."  (*Id.* at 7.)

16       [6] Moreover, the claim brought forth in plaintiff's amended complaint as to his initial
     classification is brought solely against an unnamed defendant.  (Dkt. 11 at 79-81 (identifying

17   "Mark Moe 1" as the individual who allegedly considered inaccurate information and failed to
     advise him of his alleged right to a placement review.))  "Doe," or in this case "Moe," defendants

18   are generally disfavored.  *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980).  However,
     where the identity of a defendant is not known before filing suit, courts allow a plaintiff the

19   opportunity to identify the unknown defendant through discovery, unless it is clear discovery
     would not yield the identity or that the complaint would be dismissed on other grounds.  *Wakefield*

20   *v. Thompson*, 177 F.3d 1160, 1163 (9th Cir. 1999) (citing *Gillespie*, 629 F.2d at 642).  In this
     case, plaintiff appears to identify officers "MConn" and "Okato" or "Kato" in declarations as the

21   individuals responsible for the alleged initial error in his classification.  (*See* Dkt. 51 at 21-24 and
     Dkt. 92 at 2.)  However, although he has had ample opportunity to do so, plaintiff has not sought

22   to amend his complaint to clarify the identity of either Mark Moe I or any other unnamed
     defendants.

REPORT AND RECOMMENDATION
PAGE -12

01  procedural framework for the establishment of a liberty interest.  He points specifically to DAJD

02  Policy 6.04.003, governing inmate rights and privileges, RJC's classification override policy, and

03  a D-Unit operations memorandum as conferring such an interest.  (Dkt. 82, Ex. 2; Dkt. 77, Ex.

04  A; and Dkt. 21, Ex. A.)  However, as described below, plaintiff fails to establish that, as a matter

05  of law, any of these jail policies should be construed as creating a liberty interest.

06       DAJD Policy 6.04.003 defines a "right" as an "entitlement, freedom, or privilege to do

07  something, as provided by law[,]" and a "privilege" as a "benefit or advantage granted by DAJD

08  administration[,]" or "something that is allowed, but that is not guaranteed by law." (Dkt. 82, Ex.

09  2 at 1.)  The policy further notes that "privileges will be based on security level and behavior and

10  may be rescinded partially or completely at the discretion of the Director or his or her designee."

11  (*Id.* at 3.)  Privileges include participation in religious services/counseling opportunities,

12  educational and recreational opportunities, and other inmate programs and activities, and "[m]ore

13  frequent dayroom access for shower, phones, and exercise than required by law." ( *Id.* at 2-3.)

14  As a general guideline, the policy states that "[r]ights and privileges may be curtailed, rescinded,

15  or revoked if jail security, inmate or staff safety, or major health questions are raised." (*Id.* at 2.)

16  The policy further states that rights or privileges may be restricted or revoked when an inmate is

17  considered an imminent threat to security or to the health or safety of himself or others, and that,

18  when an inmate's rights are restricted, the incident must be documented and forwarded up the

19  chain-of-command for review.  (*Id.* at 3.)

20       The classification override policy states that a "[f]ace to face interview [is] required prior

21  to all decisions to override inmate security level[,]" and overrides "can be done by staff based on

22  good behavior AND time elapsed since: escapes, violent convictions, prison time, or other relevant

REPORT AND RECOMMENDATION
PAGE -13

01 factors.  (Dkt. 77, Ex. A at 5 (emphasis in original.))  The "David Unit Management Plan"

02 memorandum states that "*[c]lose inmates who exhibit ongoing, good behavior will be reviewed*

03 *for security reduction and placement in less restrictive housing.*" (Dkt. 21, Ex. A at 3 (emphasis

04 in original.))

05       In his motion for partial summary judgment, plaintiff asserts that jail policies and rules can

06 create liberty interests because they have the binding force of law when formally adopted.  (Dkt.

07 81 at 5 (citing *Williams v. Lane*, 851 F.2d 867, 880 (7th Cir. 1988) (stating that a jail regulation

08 "had binding force because it was adopted according to proper administrative procedures and

09 required that 'housing and programmatic accommodations [for protective custody inmates] shall

10 be comparable to those provided for the general population.'"))  In his reply, plaintiff states that

11 it is well settled law that policy statements which create "'an expectation of receiving process'"

12 do not alone implicate liberty interests, and that there must also be "some state-created *substantive*

13 limitation on the prison officials' discretion."  (Dkt. 101 at 10-11 (emphasis in original) (citing

14 *Jones v. Mabry*, 723 F.2d 590, 593 (8th Cir. 1983) (quoting *Olim v. Wakinekona*, 461 U.S. 238,

15 250 n.12 (1983))))  He argues that DAJD Policy 6.04.003 imposes a substantive limitation on the

16 discretion of prison officials by requiring that an inmate be an imminent threat before rights or

17 privileges may be restricted.

18       The Court assumes for the purposes of considering plaintiff's motion that all of the jail

19 policies at issue here are of the type that could confer a liberty interest.  *See*, *e.g.*, *Baumann v.*

20 *Arizona Dep't of Corrections*, 754 F.2d 841, 844 (9th Cir. 1985) ("Published prison regulations

21 may create a protected interest. It is unclear whether unpublished administrative policy statements

22 may do so. The Supreme Court has not considered that issue, but circuit courts generally have

REPORT AND RECOMMENDATION
PAGE -14

01  held that explicit written pronouncements may create a protected interest.") (internal citation

02  omitted).  However, even applying the *Hewitt* analysis endorsed by plaintiff, the Court finds that

03  plaintiff fails to establish as a matter of law that the policies at issue create a liberty interest.  As

04  stated above, *Hewitt* requires the Court to consider whether state law "set[s] forth '"substantive

05  predicates" to govern official decision making' and . . . contain[s] 'explicitly mandatory language,'

06  *i.e.*, a specific directive to the decisionmaker that mandates a particular outcome if the substantive

07  predicates have been met."  *Valdez*, 302 F.3d at 1044 (quoting *Thompson*, 490 U.S. at 462-63

08  (quoting *Hewitt*, 459 U.S. at 472)).

09      Pursuant to DAJD Policy 6.04.003, the particular aspects of close custody at issue here

10  – participation in religious services/counseling opportunities, recreational opportunities, other

11  inmate programs and activities, and dayroom access – are privileges, which are "allowed, but . .

12  . not guaranteed by law[,]" based on security level, "may be" rescinded at the discretion of prison

13  officials, and "may be" restricted or revoked upon a determination that an inmate is an imminent

14  threat.  (Dkt. 82, Ex. 2 at 3.[7])  Plaintiff fails to establish that this language satisfies *Hewitt*.  Indeed,

15  to the contrary, rather than containing mandatory language, the policy explicitly affords prison

16  officials discretion with respect to the aforementioned "privileges."

17      The override policy is likewise discretionary and conditional in nature, stating that

18  overrides "can be" performed by prison staff.  (Dkt. 77, Ex. A at 5.)  Moreover, face to face

19  interviews are required only prior to a decision to override inmate security level, not upon a

20  transfer to a more restricted classification.  (*Id.*)  This policy, therefore, does not create a liberty

21  

22      [7] The provision of three meals a day is included as an inmate right, but the policy does not
    address the location of meals.  (Dkt. 82, Ex. 2 at 2-3.)

REPORT AND RECOMMENDATION
PAGE -15

01  interest under *Hewitt*.[8]  Finally, while the D-Unit memorandum indicates that close custody

02  inmates who exhibit ongoing, good behavior "will be" reviewed for security reduction and

03  placement in less restrictive housing ( Dkt. 21, Ex. A at 3), plaintiff fails to establish that this

04  memorandum could be reasonably construed as imposing a substantive limitation on the discretion

05  of prison officials sufficient to establish a liberty interest.[9]

06      In sum, plaintiff fails to establish that any of the jail policies at issue here impose a

07  substantive limitation on the discretion of prison officials and, therefore, fails to establish a liberty

08  interest pursuant to *Hewitt*.  For this reason, and for the reasons described above, plaintiff's

09  motion for partial summary judgment should be denied, and defendants' motion as to these issues

10  granted.

11  B.      Defendants' Motion for Summary Judgment

12      Defendants' motion for summary judgment seeks dismissal of this case in its entirety.  For

13  the reasons described below, the undersigned  finds defendants entitled to summary dismissal of

14  plaintiff's remaining claims.

15  / / /

16

17      [8] Plaintiff concedes as much in his supplemental briefing, stating: "Generally, plaintiff
18  agrees with defendants that it is not the revocation of an 'override' that implicates due process
    requirements; it is the imposition of D-Unit conditions, which resulted from the revocations [stet]
19  in this case, that crossed the obvious constitutional line."  (Dkt. 207 (altered to lower case in
    quotation.))

20      [9] The Court could consider the argument regarding the D-Unit memorandum waived based
21  on the fact that plaintiff first raised it in his reply.  *See, e.g.*, *Officers for Justice v. Civil Serv.
    Comm'n*, 979 F.2d 721, 725-26 (9th Cir. 1992) (declining to address arguments raised for the first
22  time in a reply brief).  However, given the opportunity afforded defendants to submit supplemental
    briefing in this matter, the Court finds it appropriate to address the issue.

REPORT AND RECOMMENDATION
PAGE -16

01    1.    Substantive Due Process:

02    Plaintiff raises a substantive due process claim concerning conditions in the D-Unit.  He

03    maintains that various defendants conspired to officially categorize the D-Unit as a general

04    population unit, while maintaining the unit as a de facto punitive segregation unit, with conditions

05    so severe, arbitrary, and excessive as to amount to punishment per se.  In particular, plaintiff

06    points to confinement in a cell measured six by twelve feet for all but three hours a day,

07    restrictions on religious activities, cold cell temperatures, shared and dirty mop buckets, old and

08    worn mattresses, in-cell meals, and shared hair clippers without disinfectant.[10]

09    The Eighth Amendment prohibits the cruel and unusual punishment of prisoners, while the

10    punishment of pretrial detainees is prohibited by the Fourteenth Amendment.  *Bell v. Wolfish*, 441

11    U.S. 520, 535 (1979) ("[U]nder the Due Process Clause, a detainee may not be punished prior to

12    an adjudication of guilt in accordance with due process of law.")  As plaintiff has been both a pre-

13    and post-trial detainee, the undersigned will, for the sake of simplicity, review his substantive due

14    process claim under "'the more protective fourteenth amendment standard.'" *Jones v. Blanas*, 393

15    F.3d 918, 931 (9th Cir. 2004) (quoting *Gary H. v. Hegstrom* , 831 F.2d 1430, 1432 (9th Cir.

16    1987)).  *But cf. Frost v. Agnos*, 152 F.3d 1124, 1130 (9th Cir. 1998) ("Because pretrial detainees'

17    rights under the Fourteenth Amendment are comparable to prisoners' rights under the Eighth

18    Amendment, however, we apply the same standards.")

19    The test for identifying unconstitutional punishment at the pretrial stage of a criminal

20    _____

21    [10] Plaintiff also asserted in his motion for partial summary judgment that D-Unit inmates
      are denied educational and program opportunities available in medium security.  However, he does
22    not elaborate on this contention, nor does he raise the issue in his complaint.  For these reasons,
      the Court will not further address this particular issue.

REPORT AND RECOMMENDATION
PAGE -17

01    proceeding requires a court to examine "whether there was an express intent to punish, or

02    'whether an alternative purpose to which [the restriction] may rationally be connected is assignable

03    for it, and whether it appears excessive in relation to the alternative purposes assigned [to it].'"

04    *Demery v. Arpaio*, 378 F.3d 1020, 1028 (9th Cir. 2004) (quoting *Bell*, 441 U.S. at 538).  "For a

05    particular governmental action to constitute punishment, (1) that action must cause the detainee

06    to suffer some harm or 'disability,' and (2) the purpose of the governmental action must be to

07    punish the detainee."  *Id.* at 1029.  Further, "to constitute punishment, the harm or disability

08    caused by the government's action must either significantly exceed, or be independent of, the

09    inherent discomforts of confinement."  *Id.* at 1030.

10         It is undisputed that the D-Unit is more restrictive than other units at the RJC.  Defendants

11    assert that the close security structure in the D-Unit is needed to maintain internal order and to

12    preserve security and safety.  (*See*, *e.g.*, Dkt. 21, at 1-2.)  "[M]aintaining institutional security and

13    preserving internal order and discipline are essential goals that may require limitation or retraction

14    of the retained constitutional rights of both convicted prisoners and pretrial detainees."  *Bell*, 441

15    U.S. at 546.  *Accord Jones*, 393 F.3d at 932 ("Legitimate, non-punitive government interests

16    include ensuring a detainee's presence at trial, maintaining jail security, and effective management

17    of a detention facility.")  Moreover, corrections administrators "should be accorded wide-ranging

18    deference in the adoption and execution of policies and practices that in their judgment are needed

19    to preserve internal order and discipline and to maintain institutional security."  *Bell*, 441 U.S. at

20    547.  In this case, the undisputed restrictions in D-Unit – including twenty-one hours of lock down

21    and in-cell meals – appear reasonably related to the legitimate purpose of maintaining security,

22    safety, and order, and do not appear to significantly exceed the inherent discomforts of

REPORT AND RECOMMENDATION
PAGE -18

01   confinement.  *See, e.g., Frost*, 152 F.3d at 1130 (rejecting pretrial detainee's claim that he was

02   improperly classified as a close custody inmate in light of deference to be accorded to prison

03   officials in adopting policies and practices needed to preserve internal order, discipline, and

04   security); *Chilcote v. Mitchell*, 166 F. Supp. 2d 1313, 1315, 1318 (D. Or. 2001) (confinement of

05   pretrial detainees in cramped, triple-bunked cells for 20 to 21 hours a day did not rise to the level

06   of a constitutional violation in the face of the population-based needs and security concerns). [11]

07        The parties differ as to the remaining D-Unit conditions challenged by plaintiff.  Plaintiff

08   presents numerous declarations supporting his contention as to the unavailability of group religious

09   services (*see* Dkts. 26, 27, 32, 122, 123, 126, 134), as well as one declaration attesting to the

10   availability of a "one-hour 'bible study' every other week[,]" (Dkt. 124 at 3) (quotation converted

11   to lower case).  The latter declaration provides support for defendants' contention as to the

12   availability of a bi-weekly religious service.  However, even assuming the unavailability of group

13   religious services in the D-Unit, plaintiff fails to elaborate beyond his conclusory allegation as to

14   how the absence of such services – particularly given the undisputed availability of individual

15   religious counseling – constitutes unconstitutional punishment. *See also infra* part B.5 (addressing

16   plaintiff's freedom of religion claim).

17   _____

18   [11] Although plaintiff failed to put forth any arguments in opposition to defendants' motion for summary judgment, the Court previously analyzed arguments raised by plaintiff in support of preliminary injunctive relief relating to both this and his other claims.  (*See* Dkts. 104, 106.)  For

19   example, the Court distinguished *Lock v. Jenkins*, 641 F.2d 488, 492 (7th Cir. 1981), wherein it was deemed impermissible to confine pre-trial detainees for twenty-two hours a day, as involving

20   cells which measured approximately half the size of the cells in the D-Unit.  None of the arguments previously raised by plaintiff alter the conclusion reached in this Report and Recommendation.

21   Also, as previously noted by the Court, both the above-described D-Unit memorandum and the mere fact of plaintiff's initial placement in the D-Unit upon his entry to the RJC provide support

22   for defendants' assertion that the D-Unit is not disciplinary housing.  (Dkt. 104 at 13.)

01      Plaintiff's allegations as to cell temperature, mop buckets, mattresses, and hair clippers are

02 likewise no more than conclusory and fail to create a genuine issue of material fact.   RJC

03 employees proffer evidence disputing plaintiff's assertion as to temperature and aver the

04 availability of replacement mattresses and cleaning supplies in the D-Unit upon request.  (*See* Dkt.

05 138 (stating that temperatures are maintained between the range of 71 and 74 degrees and

06 attaching document showing adequate temperatures in the unit over a two-day period) and Dkt.

07 139 (stating that inmates are responsible for the cleanliness of their cells and can request clean mop

08 bucket water, cleaning supplies – including a disinfectant for cleaning hair clippers, and

09 replacement mattresses upon request; attaching a housing inspection report on cleanliness.))  In

10 contrast, while two declarations submitted by plaintiff assert that "in-unit trustees" are not

11 available in the D-Unit to replace mop water, they do not otherwise sufficiently refute defendants'

12 assertion that clean mop water is available by other means.  (*See* Dkts. 26 & 32.)  Moreover, one

13 of those declarations merely reiterates plaintiff's conclusory assertion as to cell temperature.  (*See*

14 Dkt. 26.)  Finally, as with his claim regarding religious services, plaintiff fails to elaborate as to

15 how the conditions as alleged could be conceived as rising to the level of unconstitutional

16 punishment.  *Cf. Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982) (institution complies with

17 the Eighth Amendment in providing sentenced prisoners with "'adequate food, clothing, shelter,

18 sanitation, medical care, and personal safety.'") (quoted source omitted).

19      In sum, the undersigned concludes that plaintiff fails to proffer more than conclusory

20 assertions that the conditions in the D-Unit constitute impermissible punishment of pretrial

21

22

REPORT AND RECOMMENDATION
PAGE -20

01  detainees.[12]  Accordingly, plaintiff's substantive due process claim should be dismissed.

02          2.      Punishment without Due Process:

03          Plaintiff alleges punishment without due process with respect to various on-site

04  adjustments to which he was subjected during his confinement at the RJC.  Yet, he fails at a

05  fundamental level to demonstrate how these on-site adjustments could be construed as implicating

06  the Due Process Clause.  Indeed, the behavior at issue was not considered serious enough to

07  warrant an infraction and subsequent discipline, such as disciplinary segregation or loss of good-

08  time. (Dkt. 142, ¶¶ 5-6.)  Plaintiff was, instead, racked back to his cell for limited periods of time.

09  Given this distinction, the due process protections afforded with respect to instances wherein an

10  inmate has been unconstitutionally punished are inapplicable here.  *See Wolff v. McDonnell*, 418

11  U.S. 539, 572 n.19 (1974) ("We do not suggest, however, that the procedures required by today's

12  decision for the deprivation of good time would also be required for the imposition of lesser

13  penalties such as the loss of privileges.") [13]  Plaintiff's punishment without due process claims

14  should, therefore, be dismissed.

15          3.      Procedural Due Process Associated with Infraction:

16          Plaintiff challenges the procedures associated with his June 13, 2004 infraction.  As

17  _____

18          [12] Plaintiff also asserts in his complaint that inmates are held in the D-Unit in an effort to
    exert coercive pressure toward expedited plea agreements and to discourage jury trials.  To the
19  extent this assertion implicates the validity of plaintiff's conviction or sentence, such a claim is
    barred by *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994).  Moreover, plaintiff fails to provide
20  any support for this conclusory argument.  In fact, plaintiff did not accept a guilty plea, rather, he
    was found guilty at trial.

21          [13] WAC 289-19-220, pointed to by plaintiff, is also applicable.  That provision specifically
    describes procedures required in the face of infractions or "charges of major violation of facility
22  rules[.]"  WAC 289-19-220.

REPORT AND RECOMMENDATION
PAGE -21

01 described above, following a disciplinary hearing on the infraction, plaintiff was found guilty of

02 being defiant and insolent for admittedly using the word "bullshit," but was not found guilty of the

03 charge associated with his alleged kicking of his cell door. ( *See* Dkt. 11, App. 15.)  The RJC

04 suspended the imposition of three days of disciplinary deadlock and denied plaintiff's appeal.

05 (*Id.*)[14]

06      In *Wolff*, the United States Supreme Court outlined the minimum procedures required in

07 the face of disciplinary charges.  The Court found that due process requires, *inter alia*, a written

08 statement – addressing the charges, a description of the evidence, and an explanation for the action

09 taken – at least twenty-four hours prior to the disciplinary hearing, that written record be made

10 of the proceedings, and the opportunity to present documentary evidence and call witnesses,

11 unless such an allowance would interfere with institutional security.  418 U.S. at 563-69.

12      Plaintiff raises a number of claims as to alleged deficiencies in the procedures surrounding

13 his June 13, 2004 infraction, pointing to perceived discrepancies between various provisions of

14 Title 289 and internal RJC policies and the procedures afforded him by the RJC.  However, the

15 Due Process Clause requires only that prisoners and pretrial detainees be provided with the

16 minimum procedures mandated by  *Wolff*; it does not require compliance with a correctional

17 facility's own, more generous procedures.  *Walker v. Sumner*, 14 F.3d 1415, 1419-20 (9th Cir.

18 1994); *see also Mitchell*, 75 F.3d at 523-26 (describing applicability of *Wolff* to pretrial detainees).

19 In this case, plaintiff fails to allege any facts supporting the contention that the procedures outlined

20 in *Wolff* were not met in this case.  (*See* Dkt. 11, App. 15.)

21 _____

22      [14] The parties do not address the practical effect of this "suspended" punishment, if any, on plaintiff's claim.

REPORT AND RECOMMENDATION
PAGE -22

01          Plaintiff also avers defendant Hansen lacked impartiality given her knowledge, at the time

02   she denied his appeal, that he had named her as a defendant in a civil suit.  "The *Wolff* Court also

03   implied the obvious: that the essence of a fair hearing is an impartial decisionmaker." *Surprenant*

04   *v. Rivas*, 424 F.3d 5, 16 (1st Cir. 2005) (citing *Wolff*, 418 U.S. at 570-71). *Accord Clutchette v.*

05   *Procunier*, 497 F.2d 809, 820 (9th Cir. 1974) ("Basic to an accused prisoner's constitutional

06   guarantee of an accurate and fair fact finding determination prior to imposition of sanctions is the

07   right to be heard by an impartial disciplinary committee."), *rev'd on other grounds sub nom.*

08   *Baxter v. Palmigiano*, 425 U.S. 308 (1976).[15]  In this case, plaintiff presents evidence that may

09   support the conclusion that defendant Hansen was aware that she had been named a defendant in

10   a suit filed by plaintiff at the time she denied his appeal.  (*See* Dkt. 51, Ex. 47 (letter from plaintiff

11   to Hansen dated June 11, 2004 stating she had been named as a defendant in a lawsuit filed in

12   federal court.))

13          Although it has not been specifically addressed in the Ninth Circuit, a pending lawsuit

14   against a person serving as a decisionmaker on a prison disciplinary committee could be found to

15   implicate that individual's impartiality.  *See, e.g., Malek v. Camp*, 822 F.2d 812, 816-817 (8th Cir.

16   1987) (finding claim of personal bias by a disciplinary committee member stated a ground for relief

17   under § 1983 where the inmate had prepared and filed a suit on behalf of another inmate against

18   that decisionmaker; remanding for further proceedings); *Redding v. Fairman*, 717 F.2d 1105,

19   _____

20          [15] *See also Wolff*, 418 U.S. at 592 (Marshall, J., concurring) ("[D]ue process is satisfied
     as long as no member of the disciplinary board has been involved in the investigation or
21   prosecution of the particular case, or has had any other form of personal involvement in the
     case."); *Willoughby v. Luster*, 717 F. Supp. 1439, 1441-42 (D. Nev. 1989) (finding constitutional
22   right to disciplinary committees not containing members who investigated or witnessed alleged
     disciplinary violation).

REPORT AND RECOMMENDATION
PAGE -23

01    1112-13 (7th Cir. 1983) (finding district court's conclusion that disciplinary committee members

02    could not be named defendants in disciplinary subject's lawsuit "unnecessarily extends *Wolff's*

03    reach[,]" but remanding for consideration of the circumstances involved in the lawsuit and

04    consideration of whether disqualification was required in that particular case). *Cf. Clutchette*, 497

05    F.2d at 820 ("Nevertheless, provided that no member of the disciplinary committee has

06    participated or will participate in the case as an investigating or reviewing officer, or either is a

07    witness or has personal knowledge of material facts related to the involvement of the accused

08    inmate in the specific alleged infraction (or is otherwise personally interested in the outcome of

09    the disciplinary proceeding), a hearing board comprised of prison officials will satisfy the due

10    process requirement of a '"neutral and detached" hearing body.'") (quoted source omitted).

11         However, in this case, it is undisputed that Hansen was not a part of the disciplinary

12    committee presiding over plaintiff's infraction.  (*See* Dkt. 11, App. 15.)  Nor was she involved in

13    the incident giving rise to the infraction.  Instead, Hansen's involvement was limited to the fact

14    that she denied plaintiff's appeal of the disciplinary committee's decision.  (*Id*.)  Plaintiff fails to

15    provide any support for the contention that such involvement fails to satisfy the requirements of

16    *Wolff*.  In addition, the undersigned finds relevant the fact that plaintiff points to no more than

17    Hansen's presumed knowledge she had been named as a defendant in a lawsuit at the time she

18    processed his appeal, as well as that, as a classification supervisor, Hansen is likely frequently

19    named as a defendant in cases filed by RJC inmates.  *See, e.g., Redding*, 717 F.2d at 1112-13

20    (noting that defendants in prisoners' rights lawsuits may not know the plaintiff and may have little

21    personal involvement in the case, and that disqualification on this basis alone "would heavily tax

22    the working capacity of the prison staff[,]" and "vest too much control in a prisoner to determine

REPORT AND RECOMMENDATION
PAGE -24

01  the Committee make-up.")[16]  For these reasons, the undersigned concludes that plaintiff's denial

02  of due process claim based on Hansen's alleged lack of impartiality should also be dismissed.

03         4.    Retaliation:

04         Plaintiff alleges defendants retaliated against him in response to his filing of grievances and

05  lawsuits.[17]  He has a First Amendment right to utilize prison grievance procedures.  *See Bradley*

06  *v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995).  To prevail on a retaliation claim under § 1983,

07  however, plaintiff must show he was retaliated against for exercising his constitutional rights, that

08  the retaliatory action chilled the exercise of his First Amendment rights, and that the retaliatory

09  action did not advance legitimate penological goals, such as preserving institutional order and

10  discipline.  *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005); *Resnick v. Hayes*, 213 F.3d

11  443, 449 (9th Cir. 2000); *Barnett v. Centoni*. 31 F.3d 813, 816 (9th Cir. 1994).  Also, the Court

12  evaluates a retaliation claim in light of the deference accorded prison officials.  *Pratt v. Rowland*,

13  65 F.3d 802, 807 (9th Cir. 1995).

14         Plaintiff first alleges retaliation in the form of a rack back of his entire unit.  He points to

15  a June 11, 2004 grievance he filed asserting defendant Rogers' practice of group punishments,

16  including an instance when Rogers racked back the entire unit based on noise.  (Dkt. 11, App. 7.)

17

18         [16] (*See also* Dkt. 77, ¶ 9 (declaration from Teri Hansen stating: "I personally do not care

19  that [plaintiff] writes or sues my employer or myself.  It is not uncommon for this to happen and
    I believe I respond to each of these lawsuits with professionalism and fairness."))

20         [17] Plaintiff also avers retaliation based on defendants' alleged desire to keep him away from

21  other pretrial detainees due to his provision of legal assistance and the exposure of violations
    through his grievance and litigation activities.  However, this assertion is wholly conclusory and
    does not warrant further discussion.

22

01  Plaintiff asserts that Rogers and defendant Jones thereafter conspired to retaliate against him by

02  again racking back the unit, on this occasion based on a derogatory comment.  (*See id.* at App.

03  8 & 9.)  Yet, plaintiff's claim that this second onsite adjustment against a group of inmates was

04  taken in retaliation for his grievance against Jones is attenuated at best.  Moreover, he fails to

05  proffer any support for his bare assertion that the action in question did not advance legitimate

06  penological goals, such as preserving institutional order and discipline.  *See Pratt*, 65 F.3d at 806

07  ("The plaintiff bears the burden of pleading and proving the absence of legitimate correctional

08  goals for the conduct of which he complains.")  Nor does plaintiff show that his First Amendment

09  rights were in any way chilled by the actions of defendants.  *See Resnick*, 213 F.3d at 449.

10       Plaintiff next alleges retaliation through his transfers back into the D-Unit following the

11  revocation of his overrides.  The RJC revoked plaintiff's first override to medium security after

12  he was found guilty of engaging in defiant and insolent behavior (*see* Dkt. 11, App. 15 and Dkt.

13  97 at C), and the second following a dispute between plaintiff and defendant Coleman, in which

14  he was deemed to have engaged in challenging and disruptive behavior (*see* Dkt. 97, Ex. C).

15  These circumstances present non-retaliatory reasons for plaintiff's transfers back into the D-Unit.

16  As with the preceding claim, plaintiff fails to demonstrate that defendants' actions did not advance

17  legitimate correctional goals, *see Pratt*, 65 F.3d at 806, or that his First Amendment rights were

18  chilled by the actions of defendants, *see Resnick*, 213 F.3d at 449.[18]

19  ────────────────

20       [18] Although plaintiff asserted in association with one of his motions for preliminary
    injunctive relief that defendant Coleman had retaliatory motives against him, the Court noted that

21  evidence proffered in support of this contention was largely based on hearsay or opinions
    regarding Officer Coleman's reputation.  (*See* Dkt. 104 at 15-16.)  Moreover, plaintiff's own

22  description of the events in question provides support for defendants' contention that plaintiff had
    engaged in challenging behavior.  (*See* Dkt. 11 at 64-70.)

REPORT AND RECOMMENDATION
PAGE -26

01      Lastly, plaintiff challenges as retaliatory activity his continued housing in D-Unit and

02  classification as a close security inmate following the revocations of his overrides.  As reflected

03  in previous orders denying plaintiff's requests for preliminary injunctive relief, this claim presents

04  a closer question given defendants' admitted consideration of plaintiff's grievance activity with

05  respect to these decisions.  (*See* Dkts. 104 & 106.)  Nonetheless, after close consideration of this

06  issue and the voluminous materials before the Court, the undersigned also finds defendants entitled

07  to summary dismissal of this retaliation claim.

08      Defendants acknowledge that plaintiff's practice of filing "multiple complaints, demands

09  and lawsuits" has been a factor in decisions regarding his classification.  (Dkt. 77, at 2.)  *See also*

10  Dkt. 51, Ex. 60 (a December 2, 2004 notation states with respect to plaintiff: "Continues to

11  challenge departmental policies and procedures via grievances and possible law suits.  Thus unable

12  to authorize any override security per CPS supervision.") (quotation converted to lower case.))

13  Defendant Hansen asserts that plaintiff's use of the grievance system rises to the level of

14  harassment, describing hundreds of repetitive kites and grievances, maintaining that plaintiff's

15  "enormous demands" on the RJC "can disrupt the flow of services to other inmates due to staffing

16  and resource limitations[,]" and asserting her belief that plaintiff "seems to make deliberate

17  attempts to create situations that become the basis for additional complaints[.]"  (Dkt. 77 at 2.)

18  Ms. Hansen further states that plaintiff "challenges and abuses staff and willfully disrupts

19  operations" and "encourages other inmates to engage in similar behavior[.]"  (*Id.* at 3.)  Sergeant

20  Dreyer asserts that plaintiff's conduct harasses and distracts officers and disrupts jail operations,

21  and that this disruption and harassment represents a serious threat to the safe, orderly, and secure

22  operation of the facility.  (Dkt. 78 at 2-3.)  Defendant DeNeui states that the hundreds of

REPORT AND RECOMMENDATION
PAGE -27

01  grievances and kites filed by plaintiff amount to harassment, are "designed to disrupt the internal

02  order of the jail by flooding the system[,]" take time away from serving other inmates, impact

03  operations, and "must be managed to maintain internal order." (Dkt. 97 at 4.) (*See also* Dkt. 142

04  at 5-6 (Major William Hayes states that plaintiff "abused the grievance process" by filing hundreds

05  of grievances and kites.)) Defendants, therefore, argue that the RJC "has a legitimate penological

06  interest in preventing Mr. Silva from being reduced to a lower security level based on the behavior

07  he has exhibited and negatively influencing other inmates." (Dkt. 77, at 4.)

08          Although the precise volume is disputed, the evidence before the Court unequivocally

09  establishes plaintiff's status as a prolific filer of grievances and kites during his stay at the RJC.

10  (*Compare*, *e.g.*, Dkt. 142 at 5-6 and Exs. B & C (asserting plaintiff's own filing system shows he

11  wrote over 600 grievances and hundreds of kites during his incarceration; attaching numerous

12  grievances and kites), *with* Dkt. 92 at 4 & 8 (asserting that he filed about 100 grievances and at

13  least 100 kites during his stay at the RJC.)) In addition, a review of that evidence confirms

14  practices identified by defendants as abusive, including duplicative filings and filings based solely

15  on plaintiff's dissatisfaction with the content and timeliness of responses received in regard to

16  previous grievances and kites. ( *See*, *e.g.*, Dkt. 142.) Further, declarations submitted by

17  defendants outline the detrimental effects of these practices on the internal order, security, and

18  safety of the facility. (*See* Dkts. 77-78, 97, 142.) Finally, it should be noted both that plaintiff was

19  classified as a close security inmate and housed in the D-Unit when he entered the RJC in April

20  2004, before he filed any grievances and lawsuits, that he was indisputably subject to a number of

21  onsite adjustments during his detainment, and that his behavior – apart from his grievance activity

22  – twice resulted in his return to the D-Unit.

REPORT AND RECOMMENDATION
PAGE -28

01      The Court accords prison officials "'wide-ranging deference in the adoption of policies and

02  practices that in their judgment are needed to preserve internal order and discipline and to maintain

03  institutional security.'" *Frost*, 152 F.3d at 1130 (discussing within the context of a prisoner's

04  classification as a close security inmate) (quoting *Bell*, 441 U.S. at 540).  Here, the above-

05  described evidence supports defendants' contention that the consideration of plaintiff's grievance

06  activity in decisions associated with his housing and classification was not retaliatory; rather, it was

07  a reasonable attempt to minimize plaintiff's opportunity to disrupt the functioning of the RJC and,

08  therefore, was grounded in concerns of internal order and discipline, security, and safety.  *Cf.*

09  *Rouse v. Benton*, 193 F.3d 936, 941 (8th Cir. 1999) (inmate may be transferred for filing frivolous

10  or repetitive grievances).  In turn, plaintiff fails to establish either the absence of legitimate

11  correctional goals for defendants' actions, *see Pratt*, 65 F.3d at 806, or a resulting chilling effect

12  on his First Amendment rights, *see Resnick*, 213 F.3d at 449.  For these reasons, and for the

13  reasons described above, all of plaintiff's retaliation claims should be dismissed.

14      5.   <u>Religion</u>:

15      Plaintiff avers defendants violated his First Amendment Right to practice his Christian faith.

16  Specifically, he maintains defendants violated this right by denying him the opportunity to attend

17  weekly worship services, as well as a mechanism by which to mail tithes.

18      In order to establish that defendants violated his right to exercise his religious beliefs,

19  plaintiff must show they "burdened the practice of his religion, by preventing him from engaging

20  in conduct mandated by his faith, without any justification reasonably related to legitimate

21  penological interests." *Freeman v. Arpaio*, 125 F.3d 732, 736 (9th Cir.1997) (internal footnote

22  omitted) (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987)).  In assessing the reasonableness of the

REPORT AND RECOMMENDATION
PAGE -29

01  challenged conduct, the Court looks to, *inter alia*, whether there is a logical connection between

02  the regulation at issue and a legitimate government interest, whether alternative means to exercise

03  the asserted right exist, and the impact the requested accommodation would have on prison

04  resources. *Id.* (citing *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 350-52 (1987) (citing *Turner*,

05  482 U.S. at 84-89.))  "In order to reach the level of a constitutional violation, the interference with

06  one's practice of religion 'must be more than an inconvenience; the burden must be substantial and

07  an interference with a tenet or belief that is central to religious doctrine.'"  *Id.* at 737 (quoting

08  *Graham v. C.I.R.*, 822 F.2d 844, 851 (9th Cir. 1987)).

09           In this case, plaintiff fails to establish a violation of his right to practice his religious beliefs.

10  There is no evidence weekly attendance at group worship services or tithing is mandated by

11  plaintiff's Christian faith.  In fact, plaintiff merely expresses his "desire[]" to engage in these

12  practices. (Dkt. 11 at 82.)  Moreover, plaintiff does not dispute the fact that D-Unit inmates are

13  afforded other opportunities for practicing their religious beliefs, including access to individual

14  religious counseling upon request, or explain how those opportunities do not suffice to meet the

15  mandates of his faith.  *See, e.g., Zatko v. Rowland*, 835 F. Supp. 1174, 1177 (N.D. Cal. 1993)

16  (finding legitimate penological interests for denying inmate access to group religious services and

17  noting inmate could "worship by other means such as choosing a religious advisor from one of

18  many denominations or possessing religious literature in his cell.")  Nor does he dispute the

19  apparent lack of evidence to support any attempts on his behalf to afford himself of such

20  opportunities. ( *See, e.g.,* Dkt. 97 at 4.)  Finally, as discussed above, defendants proffer

21  justifications for the greater restrictions in the D-Unit based on the legitimate purposes of

22  maintaining order, security, and safety.  For these reasons, plaintiff's freedom of religion claim

REPORT AND RECOMMENDATION
PAGE -30

01  should be dismissed.[19]

02                                        Conclusion

03          For the foregoing reasons, this Court recommends that plaintiff's partial motion for

04  summary judgment be DENIED, that defendants' motion for summary judgment be GRANTED,

05  and that this matter be DISMISSED with prejudice.  A proposed order accompanies this Report

06  and Recommendation.

07          DATED this  17th  day of  January , 2005.

08

09                                        _____
                                          Mary Alice Theiler
10                                        United States Magistrate Judge

11

12

13

14

15

16

17

18

19  _____

20          [19] In finding the underlying claims subject to dismissal, the undersigned need not address
     plaintiff's related "failure to supervise/train" claims.  Likewise, because it otherwise finds plaintiff's
21   claims subject to dismissal, the undersigned need not address defendants' arguments as to the lack
     of personal participation on the part of certain defendants, the holding of *Monell v. Department*
22   *of Soc. Servs.*, 426, U.S. 658 (1978), or qualified immunity.

REPORT AND RECOMMENDATION
PAGE -31